EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Jaime Isaac Sánchez Rivera

Recurrido

v.

Herbert J. Sims & Co., Inc.

Peticionario | Certiorari

2022 TSPR 20

208 DPR \_\_\_\_ |
|---|---|

Número del Caso:  CC-2020-412


Fecha: 16 de febrero de 2022


Tribunal de Apelaciones:

    Panel II


Abogado de la parte peticionaria:

    Lcdo. Enrique Figueroa Llinás


Abogado de la parte recurrida:

    Lcdo. José A. Pagán Nieves


Materia:  Arbitraje FINRA – Notificación de querella: La doctrina de los esfuerzos adicionales razonables esbozada en Román Ortiz v. OGPe, 203 DPR 947 (2020), no se extiende a un procedimiento de arbitraje ante una entidad privada que tiene su propia reglamentación.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jaime Isaac Sánchez Rivera

     Recurrido

         v.

Herbert J. Sims & Co., Inc.

     Peticionario

CC-2020-412      *Certiorari*

El Juez Asociado Señor Feliberti Cintrón emitió la Opinión del Tribunal.

En San Juan, Puerto Rico, a 16 de febrero de 2022.

En esta ocasión nos corresponde resolver si la doctrina esbozada en Román Ortiz v. OGPe, 203 DPR 947 (2020), en cuanto a exigir que una agencia administrativa realice esfuerzos adicionales razonables en el contexto de la notificación de una decisión final que es devuelta, aplica también en relación con la notificación de una querella como parte de un procedimiento de arbitraje ante la *Financial Industry Regulatory Authority* (FINRA).

Por los fundamentos que se discuten más adelante, resolvemos que la doctrina sentada en Román Ortiz v. OGPe, *supra*, sólo aplica en el contexto de las agencias administrativas y no se extiende a un

procedimiento de arbitraje ante FINRA, la cual es una entidad privada que tiene su propia reglamentación uniforme para todas las jurisdicciones.[1] Así, revocamos la *Sentencia* emitida por el Tribunal de Apelaciones y reinstalamos la *Sentencia* dictada por el Tribunal de Primera Instancia. Veamos, pues, los antecedentes fácticos que originaron la presente controversia.

## I

La empresa Herbert J. Sims & Co., Inc. (HJ Sims) se dedica al negocio de la banca de inversiones, corretaje de valores y provee una amplia variedad de servicios financieros a sus clientes. Por su parte, el Sr. Jaime Isaac Sánchez Rivera (señor Sánchez Rivera) trabajó como *registered representative* o corredor de valores (también conocido como consultor de inversiones o bróker) de HJ Sims desde el 1 de mayo de 2014 hasta el 24 de abril de 2017. Durante el mencionado periodo, ambas partes eran miembros de FINRA.

A. Trasfondo fáctico **previo** a la presentación de la *Querella* ante FINRA

El 1 de mayo de 2014, el señor Sánchez Rivera suscribió un contrato de empleo para trabajar como consultor de inversiones en la oficina de HJ Sims en San Juan,

---

[1] Sobre el asunto de las jurisdicciones que atiende la *Financial Industry Regulatory Authority* (FINRA), el inciso (b)(17) de la Regla 0160 del Reglamento de dicha entidad menciona el término "State", el cual se refiere a Estados Unidos, Distrito de Columbia, Puerto Rico, Islas Vírgenes y cualquier otra posesión de Estados Unidos. Véase Financial Industry Regulatory Authority, *Definitions*, https://www.finra.org/rules-guidance/rulebooks/finra-rules/0160 (última visita, 14 de febrero de 2022).

Puerto Rico. Como parte del contrato, a los fines de ejercer sus funciones, se requería que el señor Sánchez Rivera estuviera registrado en FINRA, por lo que se consideraba un *registered representative* (según definido por dicha entidad).[2] Además, el mismo día de su contratación, el señor Sánchez Rivera presentó el *Form U4* (Formulario U4) según lo requiere FINRA como parte del registro para desempeñarse como *registered representative*.[3]

Asimismo, en el contrato de empleo se incluyó una cláusula de arbitraje obligatorio mediante la cual se estableció que cualquier disputa, controversia o reclamación que surgiera o se relacionara al mismo se resolvería a través del procedimiento de arbitraje ante FINRA y según su

---

[2]  *Employment Agreement*, Apéndice del *certiorari*, pág. 133.  Según FINRA, el término *registered representative* significa:

> "A broker-dealer firm is in the business of buying and selling securities —stocks, bonds, mutual funds, and certain other investment products— on behalf of its customers (as broker), for its own account (as dealer), or both. The registered financial professionals who work for broker-dealers —the sales personnel whom some people refer to as stockbrokers— are technically known as registered representatives".  Véase Financial Industry Regulatory Authority, *Registered Financial Professionals*, https://www.finra.org/investors/learn-to-invest/choosing-investment-professional/registered-financial-professionals (última visita, 14 de febrero de 2022).

[3]  *Form U4 Uniform Application for Securities Industry Registration or Transfer*, Apéndice del *certiorari*, págs. 279-293.  En las instrucciones para completar el *Form U4* (Formulario U4) se especifica lo siguiente:

> "Representatives of broker-dealers, investment advisers, or issuers of securities must use this form to become registered in the appropriate jurisdictions and/or SROs.  These instructions apply to the filing of Form U4 electronically with the Central Registration Depository ("CRD")…".  (Subrayado nuestro y énfasis omitido). Íd., pág. 262.

En particular, las siglas "SRO" se refieren al término *Self Regulatory Organization*, la cual en este caso es FINRA.

reglamentación.  De igual forma, se dispuso que la determinación del árbitro sería final y vinculante.[4]

A su vez, las partes acordaron que los términos de compensación del señor Sánchez Rivera incluirían tres (3) préstamos conocidos como *Employee Forgivable Loans* (EFL) por $116,620.[5]  Según lo pactado, éstos serían repagados conforme al esquema de los años en el empleo y el desempeño del empleado.[6] Específicamente, HJ Sims desembolsó los EFL a favor del señor Sánchez Rivera de esta manera: (1) $30 mil mediante una transferencia electrónica realizada el 5 de junio de 2014; (2) $41,037 a través de un cheque emitido el 31 de agosto de 2015, y (3) $45,583 mediante una transferencia electrónica efectuada el 1 de agosto de 2016.[7]

---

[4]  *Employment Agreement*, Apéndice del *certiorari*, pág. 139. La cláusula novena del contrato de empleo lee de la manera siguiente:

> "9. <u>Governing Law, Dispute Resolution and Jurisdiction</u>. This Agreement shall be construed in accordance with the laws of the Commonwealth of Puerto Rico and, to the extent applicable, the federal laws of the United States of America and the rules and regulations of FINRA.  The Employee understands that failure to comply with such laws, rules or regulations may result in disciplinary action against him/her by FINRA and/or any governmental authority having jurisdiction. <u>Any dispute, controversy, or claim arising out of or relating to this Agreement will be settled in arbitration before FINRA in accordance with its rules and regulations.</u>  The Employee agrees to stipulate with the Company, upon the Company's request, to expedited hearing procedures for such arbitration. <u>The Parties agree that the arbitration will take place in San Juan, Puerto Rico, and that the decision of the arbitrator(s) will be final and binding</u>". (Énfasis suplido). <u>Íd.</u>

[5]  En particular, la cláusula quinta del contrato de empleo disponía sobre los acuerdos de préstamos y refería a los términos incluidos en el *Schedule B* del contrato, en el cual se especificaban los términos de los préstamos.  *Employment Agreement*, Apéndice del *certiorari*, págs. 143-144.

[6]  <u>Íd.</u>

[7]  *Statement of Claim*, Apéndice del *certiorari*, pág. 83.

Luego de casi tres (3) años como empleado de HJ Sims, el señor Sánchez Rivera renunció a su empleo, efectivo el 24 de abril de 2017. Esto ocurrió antes del vencimiento del periodo de condonación de los EFL.[8] Al momento de su renuncia, el señor Sánchez Rivera adeudaba $80,547 a HJ Sims por concepto del balance adeudado correspondiente a los mencionados préstamos. Para esa fecha, el señor Sánchez Rivera había repagado sólo $36,073 por esos préstamos y su último pago fue realizado el 31 de marzo de 2017, previo a su renuncia.[9]

Ante la falta de pago, el 30 de mayo de 2017, HJ Sims envió al señor Sánchez Rivera una primera carta de cobro, en la cual le requirió el pago del balance pendiente por $80,547 y le advirtió que podría iniciar una acción legal en cobro de dinero si el pago no se recibía en su totalidad, en o antes del 30 de junio de 2017.[10]

Más adelante, el 31 de agosto de 2017, HJ Sims remitió una segunda carta de cobro al señor Sánchez Rivera. Según surge de dicha comunicación, el 30 de junio de 2017 el señor Sánchez Rivera había solicitado a HJ Sims -mediante correo electrónico- un tiempo adicional para contestar la primera carta de cobro. No obstante, al pasar dos (2) meses sin tener respuesta, HJ Sims emitió esa segunda carta de cobro, en la cual le ofreció al señor Sánchez Rivera un plan de

---

[8] *Letter of resignation*, Apéndice del *certiorari*, pág. 234.

[9] *Statement of Claim*, Apéndice del *certiorari*, pág. 84.

[10] *Demand Letter*, Apéndice del *certiorari*, pág. 214.

pago a cumplirse en su totalidad el 15 de diciembre de 2017 y le advirtió que si no cumplía con el mismo, entonces se reservaba el derecho de proceder legalmente -sin previa notificación- para recobrar el balance adeudado.[11] Ambas cartas de cobro fueron enviadas por HJ Sims a la dirección residencial del señor Sánchez Rivera, según constaba en su contrato de empleo con HJ Sims.[12]

### B. Trasfondo fáctico **posterior** a la presentación de la *Querella* ante FINRA

El 25 de septiembre de 2018, HJ Sims presentó un *Statement of Claim* (*Querella*) ante FINRA en contra del señor Sánchez Rivera, en la que reclamó el pago de $80,547 por el balance pendiente de los EFL más intereses, costas y honorarios de abogado.[13]

Como parte del proceso ante FINRA, el 28 de septiembre de 2018, dicha entidad envió al señor Sánchez Rivera -por correo regular- una primera notificación de la *Querella* (*Claim Notification Letter*). En ésta, FINRA le notificó al señor Sánchez Rivera que la *Querella* presentada por HJ Sims se atendería mediante arbitraje en dicho foro y que tenía hasta el 19 de noviembre de 2018 para presentar su *Statement of Answer (Contestación a la Querella)*.[14] Esta comunicación

---

[11] *Second Demand Letter*, Apéndice del *certiorari*, pág. 215.

[12] En particular, se refiere a una dirección en la Ave. Ramírez de Arellano en Guaynabo, Puerto Rico. Para fines de mantener la confidencialidad sobre la dirección específica, aquí solo utilizaremos dicha referencia. Véase *Employment Agreement*, Apéndice del *certiorari*, pág. 133.

[13] *Statement of Claim*, Apéndice del *certiorari*, págs. 82-85.

[14] *Claim Notification Letter*, Apéndice del *certiorari*, págs. 237-238.

fue enviada a la dirección que el señor Sánchez Rivera tenía registrada en el *Central Registration Depository* (CRD) de FINRA,[15] a saber: **C 15 #1260 Ext. San Agustín, San Juan, PR 00926.**[16] Esta notificación de la *Querella* fue devuelta por correo a FINRA el 10 de octubre de 2018 con una nota que leía: *return to sender*.[17]

Ante esa situación, FINRA envió -a la misma dirección que constaba en el CRD de FINRA- una <u>segunda notificación de la *Querella*</u> al señor Sánchez Rivera, tanto por correo regular como por el *DR Portal*,[18] esto mediante un *Overdue Notice*. De igual forma, dicha notificación también fue devuelta por correo el 30 de noviembre de 2018 con esta nota: *return to sender*.[19] En noviembre de 2018, FINRA envió una carta al señor Sánchez Rivera para informarle que no había recibido su Contestación a la *Querella*. Además, le

---

[15] Conviene señalar que: "FINRA is responsible for the Central Registration Depository (CRD) program, which supports the licensing and registration filing requirements of the U.S. securities industry and its regulators." Véase *Central Registration Depository (CRD)*, en https://www.finra.org/registration-exams-ce/classic-crd (última visita, 14 de febrero de 2022).

[16] La mencionada dirección está incluida bajo el acápite *Address listed on CRD at time of initial claim service*, según surge de los registros de FINRA. Véase *Service History Report*, Apéndice del *certiorari*, pág. 150.

[17] Véase *Service History Report*, Apéndice del *certiorari*, págs. 150-151.

[18] De acuerdo con la página electrónica de FINRA, el *DR Portal* consta de dos (2) partes: el *DR Neutral Portal* dirigido a los árbitros y mediadores de FINRA, y el *DR Party Portal* dirigido a las partes en los procesos de arbitraje y mediación en FINRA. En particular, las partes pueden utilizar el *DR Party Portal* para revisar documentos del caso, presentar documentos ante FINRA, programar fechas de vistas, entre otros. Véase https://www.finra.org/arbitration-mediation/dr-portal (última visita, 14 de febrero de 2022).

[19] Véase *Service History Report*, Apéndice del *certiorari*, págs. 151-152.

advirtió que si no contestaba, entonces el árbitro podría prohibirle presentar defensas y el proceso continuaría en rebeldía.[20]    En esta comunicación, FINRA también incluyó copia de la *Querella* presentada.    Así pues, ésta sería la tercera notificación de la *Querella* a la dirección que constaba en el CRD de FINRA.

Más adelante, el 13 de diciembre de 2018, FINRA le comunicó a HJ Sims que no había podido notificar la *Querella* a la dirección que constaba en el CDR de FINRA.    Asimismo, le indicó que el caso continuaría con o sin la contestación del señor Sánchez Rivera y que sería el árbitro quien tomaría la decisión final sobre la notificación de la *Querella*. A su vez, FINRA solicitó a HJ Sims que le proveyera una dirección alterna del señor Sánchez Rivera para intentar notificar nuevamente la *Querella*.[21]

En cumplimiento con lo ordenado, el 14 de diciembre de 2018, HJ Sims proveyó a FINRA una dirección alterna del señor Sánchez Rivera, a saber: **First Southern, LLC, Metro Office Park, 8 Calle #1, Ste. 401, Guaynabo, PR 00968-1772.**[22] Posteriormente, el 21 de diciembre de 2018, HJ Sims presentó ante FINRA un *Notice of Service* mediante el cual hizo constar

---

[20]    Carta de FINRA de 20 de noviembre de 2018, Apéndice del *certiorari*, pág. 259.

[21]    Carta de FINRA de 13 de diciembre de 2018, Apéndice del *certiorari*, pág. 146.

[22]    Esta dirección correspondía al lugar de empleo del Sr. Jaime Isaac Sánchez Rivera (señor Sánchez Rivera).    Véanse *Notice of Respondent's Alternative Address to Perfect Service*, Apéndice del *certiorari*, págs. 248-249; Carta de HJ Sims a FINRA del 14 de diciembre de 2018, Apéndice del *certiorari*, pág. 304.

que -el 18 de diciembre de 2018- un emplazador notificó la *Querella* y otros documentos relacionados al procedimiento de arbitraje en la dirección alterna provista; junto a esto incluyó un *Proof of Service*.**23** Así, el 28 de diciembre de 2018, FINRA notificó al señor Sánchez Rivera sobre el mencionado *Notice of Service* presentado por HJ Sims; dicha comunicación se envió a la dirección alterna provista.**24** **Del expediente no surge que esta notificación de FINRA fuera devuelta por el correo postal.**

Posteriormente, el 25 de enero de 2019, FINRA envió una carta al señor Sánchez Rivera para comunicarle la fecha y otros detalles sobre la vista evidenciaria que se efectuaría el 17 de abril de 2019 como parte del procedimiento de arbitraje.**25** Luego, el 25 de febrero y el 11 de abril de 2019, FINRA envió al señor Sánchez Rivera unos

---

**23** *Notice of Service,* Apéndice del *certiorari*, págs. 251-253. En el *Proof of Service* consta una firma seguida de un nombre que lee: "Jaime Santiago, Consultor Financiero". *Notice of Service,* Apéndice del *certiorari*, pág. 253.

Recuérdese que la dirección alterna del señor Sánchez Rivera -según provista por HJ Sims a FINRA- era la siguiente: First Southern, LLC, Metro Office Park, 8 Calle #1, Ste. 401, Guaynabo, PR 00968-1772. En particular, First Southern, LLC, era el lugar de empleo del señor Sánchez Rivera en diciembre de 2018 y desde ese mismo año allí trabaja el Sr. Jaime Santiago como Vicepresidente Senior/Consultor Financiero. Véase https://fssec.com/about-first-southern/wealth-management/ (última visita, 14 de febrero de 2022).

**24** Carta de FINRA de 28 de diciembre de 2018, Apéndice del *certiorari*, pág. 250.

**25** Carta de FINRA de 25 de enero de 2019, Apéndice del *certiorari*, págs. 305-309. Dicha comunicación incluía los siguientes documentos: *Initial Pre-Hearing Conference Scheduling Order* y *Case Information Sheet*. Véanse *Initial Pre-Hearing Conference Scheduling Order,* Apéndice del *certiorari*, págs. 318-325; *Case Information Sheet,* Apéndice del *certiorari*, págs. 310-311.

recordatorios sobre la mencionada vista.[26] **Todas estas comunicaciones fueron enviadas a la dirección alterna provista por HJ Sims y no surge que fueran devueltas por el correo postal.**

Una vez celebrada la vista evidenciaria, a la cual no compareció el señor Sánchez Rivera, el árbitro de FINRA emitió su *Laudo* el 24 de abril de 2019. **Del expediente no surge que la notificación del mismo fuese devuelta por el correo postal.[27]** En particular, el árbitro determinó que, aun cuando el señor Sánchez Rivera no presentó un acuerdo de sumisión, estaba obligado a someterse al procedimiento de arbitraje según lo establece el Código de Procedimiento de Arbitraje de FINRA. De igual manera, afirmó que el señor Sánchez Rivera estaría obligado por la decisión que se emitiese respecto a todas las controversias o asuntos presentados. Además, el árbitro concluyó que el señor Sánchez Rivera fue debidamente notificado de la *Querella* en su contra y de la vista señalada en el caso, por lo que determinó que el arbitraje continuaría en ausencia de éste, según dispone el Código de Procedimiento de Arbitraje de FINRA. Así las cosas, el árbitro concluyó que el señor Sánchez Rivera tenía que pagar a HJ Sims lo siguiente:

---

[26] Véanse Carta de FINRA de 25 de febrero de 2019, Apéndice del *certiorari*, págs. 312-313; Carta de FINRA de 11 de abril de 2019, Apéndice del *certiorari*, págs. 316-317.

[27] El *Laudo* fue enviado junto a una carta de FINRA a la dirección alterna. Según se mencionó previamente, éste era el lugar de empleo del señor Sánchez Rivera para esa fecha. Véase Carta de FINRA de 24 de abril de 2019, Apéndice del *certiorari*, págs. 195-201.

(1) $80,547 por daños compensatorios; (2) intereses sobre dicha cantidad a razón de 5% anual a partir del 25 de septiembre de 2018 (fecha en la que HJ Sims presentó la *Querella*), y (3) $1,000 como reembolso por los gastos de presentación de la *Querella*. Asimismo, dispuso que debía pagar directamente a FINRA por otros gastos establecidos en el Código de Procedimiento de Arbitraje de FINRA.[28]

En desacuerdo con la decisión del árbitro, el 22 de mayo de 2019, el señor Sánchez Rivera presentó ante el Tribunal

---

[28] En lo pertinente, el árbitro de FINRA dispuso lo siguiente en su *Laudo*:

### OTHER ISSUES CONSIDERED AND DECIDED

Respondent did not file with FINRA Office of Dispute Resolution a properly executed Submission Agreement but is required to submit to arbitration pursuant to the Code of Arbitration Procedure ("Code"), and is bound by the determination of the Arbitrator on all issues submitted.

Respondent did not appear at the evidentiary hearing. Upon review of the file and the representations made by/on behalf of Claimant, the Arbitrator determined that Respondent has been properly served with the Statement of Claim and received due notice of the hearing, and that arbitration of the matter would proceed without said Respondent present, in accordance with the Code.

### AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, if any, the Arbitrator has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable for and shall pay to Claimant the sum of $80,547.00 in compensatory damages.

2. Respondent is liable for and shall pay to Claimant interest on the above-stated sum at the rate of 5% per annum from September 25, 2018 through and including the date of payment of this Award.

3. Respondent is liable for and shall reimburse Claimant the sum of $1,000.00, representing the non-refundable portion of the initial claim filing fee previously paid by Claimant to FINRA Dispute Resolution.

4. Any and all claims for relief not specifically addressed herein, including Claimant's request for attorneys' fees, are denied. Véase *Laudo*, Apéndice del *certiorari*, págs. 198-201.

de Primera Instancia una *Solicitud de revocación de laudo de arbitraje*. En síntesis, alegó que el *Laudo* era nulo debido a que no fue notificado personalmente de la *Querella* conforme a la Regla 4.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 4.4. También adujo que, ante la falta de un acuerdo de sumisión, la controversia no podía ser adjudicada por FINRA y, por tanto, la decisión del árbitro no era vinculante.[29] Además, planteó que el *Laudo* le privaría de su propiedad sin el debido proceso de ley porque, de no pagar la suma indicada en el término concedido por FINRA, se expondría a que dicha entidad le cancelara sus licencias para trabajar como asesor financiero y podría perder su única fuente de sustento.[30] Por todo lo anterior, el señor Sánchez Rivera esbozó que procedía la revocación del *Laudo*.

Por su parte, el 28 de junio de 2019, HJ Sims se opuso a la *Solicitud de revocación de laudo de arbitraje*. En resumen, planteó que todo el procedimiento de arbitraje se hizo según las normas aplicables; que el señor Sánchez Rivera fue notificado del procedimiento mediante los métodos de notificación permitidos por las Reglas de FINRA, los cuales fueron autorizados expresamente por éste; que el árbitro concluyó que la notificación se hizo conforme a la

---

[29] *Solicitud de revocación de laudo de arbitraje*, Apéndice del *certiorari*, págs. 90-101.

[30] *Solicitud de revocación de laudo de arbitraje,* Apéndice del *certiorari*, págs. 93-94 y 100-101. Valga mencionar que, **por motivos no relacionados con este caso**, las licencias del señor Sánchez Rivera como asesor financiero fueron suspendidas efectivo el 15 de junio de 2020 y, por consiguiente, fue dado de baja de los registros de FINRA. Véase *Moción informando recientes desarrollos pertinentes y sobre otros extremos*, Apéndice del *certiorari*, págs. 331-332.

reglamentación aplicable; que el señor Sánchez Rivera fue advertido sobre sus derechos, sus obligaciones y las consecuencias de su incumplimiento con el proceso de arbitraje, así como que fue notificado de todos los documentos presentados ante FINRA.[31]

Luego de evaluar los argumentos de ambas partes, así como la prueba presentada en el caso, el 20 de noviembre de 2019, el tribunal de instancia emitió una *Sentencia* mediante la cual proveyó *No Ha Lugar* a la *Solicitud de revocación de laudo de arbitraje* presentada por el señor Sánchez Rivera. En consecuencia, se confirmó el *Laudo*, y se ordenó la desestimación y el archivo del caso.

En su dictamen, el foro de instancia le brindó deferencia a la conclusión del árbitro en cuanto a que el señor Sánchez Rivera fue debidamente notificado de la *Querella* en su contra y que, ante su incomparecencia, procedía continuar con el proceso de arbitraje. Añadió que ante el árbitro quedó demostrado que el contrato de empleo suscrito entre HJ Sims y el señor Sánchez Rivera tenía una cláusula de arbitraje obligatorio de acuerdo con la reglamentación de FINRA y que, por lo tanto, esas reglas estaban incorporadas a dicho acuerdo. También expuso que -como miembro de FINRA- aunque no presentó el acuerdo de sumisión ante esa entidad regulatoria- el señor Sánchez Rivera se obligó a arbitrar

---

[31] *Oposición a la solicitud de revocación de laudo de arbitraje y solicitud de confirmación de laudo de arbitraje,* Apéndice del *certiorari*, págs. 181-194.

cualquier controversia que surgiera del contrato en cuestión y se sometió a toda la reglamentación de FINRA, incluyendo a los métodos de notificación de las querellas y a las consecuencias de no comparecer ante el proceso de arbitraje.[32] Finalmente, puntualizó que era meritorio señalar que "aunque el [señor] Sánchez Rivera indicó que no fue adecuadamente notificado sobre el proceso de arbitraje en su contra, [é]ste sí se enteró del laudo a través de los mismos medios de notificación que se utilizaron para el diligenciamiento de la notificación de la querella".[33]

Inconforme con la decisión del tribunal de instancia, el señor Sánchez Rivera presentó una solicitud de reconsideración, mas ésta fue denegada el 9 de diciembre de 2019. Así pues, en desacuerdo con dicha determinación, el 9 de enero de 2020 recurrió al foro apelativo intermedio.

Más adelante, el 29 de junio de 2020, el Tribunal de Apelaciones emitió una *Sentencia* -notificada el 28 de julio de 2020- mediante la cual revocó la decisión del foro de instancia y devolvió el caso para que se atendieran unos asuntos en particular. Fundamentándose en lo resuelto en Román Ortiz v. OGPe, *supra*, en cuanto a la suficiencia de la notificación que realice una agencia administrativa sobre una decisión final adversa emitida en un procedimiento adjudicativo de la propia agencia, el foro apelativo

---

[32] *Sentencia del Tribunal de Primera Instancia*, Apéndice del *certiorari*, págs. 120-131.

[33] Íd., pág. 130.

intermedio concluyó que "el [tribunal de instancia] incidió al no evaluar la suficiencia de las notificaciones emitidas por FINRA conforme al estándar establecido por el Tribunal Supremo [de Puerto Rico] sobre esfuerzos razonables".[34] Añadió que el tribunal de instancia también "falló en hacer alguna determinación respecto a la autoridad de FINRA para permitir que [HJ] Sims realizara una notificación de encargo al señor Sánchez Rivera".[35] Por consiguiente, el Tribunal de Apelaciones determinó que procedía devolver el caso al tribunal de instancia para "evaluar la suficiencia de las notificaciones de FINRA, su cumplimiento con la reglamentación antes citada y así [determinar] la jurisdicción de dicha agencia para emitir el Laudo en controversia".[36]

Inconforme con la decisión del foro apelativo intermedio, el 7 de agosto de 2020, HJ Sims presentó una *Moción de reconsideración* ante el Tribunal de Apelaciones, la cual fue denegada el 25 de agosto de 2020.[37] Insatisfecho con esa determinación, el 13 de octubre de 2020, HJ Sims presentó un recurso de *certiorari* ante este Foro. Como único señalamiento de error expuso lo siguiente:

> **Erró el Tribunal de Apelaciones al revocar la Sentencia del [Tribunal de Primera Instancia] por el fundamento de que era necesario evaluar si FINRA**

---

[34] *Sentencia del Tribunal de Apelaciones*, Apéndice del *certiorari*, pág. 18.

[35] Íd.

[36] Íd., pág. 19.

[37] El archivo en autos de copia de la notificación de la *Resolución* fue el 15 de septiembre de 2020.

**cumplió con el estándar sobre esfuerzos razonables y si tenía autoridad para requerirle a [HJ Sims] diligenciar otra notificación al [señor Sánchez Rivera].**

El 12 de noviembre de 2020, el señor Sánchez Rivera presentó una *Oposición a expedición de certiorari.* Más adelante, el 4 de diciembre de 2020 expedimos el auto de *certiorari* solicitado. Como parte del trámite apelativo, HJ Sims presentó su Alegato el 9 de marzo de 2021, mientras que el señor Sánchez Rivera presentó el suyo el 21 de mayo de 2021. Así las cosas, el caso quedó sometido en los méritos el 24 de mayo de 2021.

Con el beneficio de la comparecencia de ambas partes, procedemos a examinar el derecho aplicable para resolver la controversia planteada.

## II

### A. <u>FINRA y el procedimiento de arbitraje</u>

FINRA es una entidad reguladora no gubernamental sin fines de lucro que reglamenta y supervisa a todos los individuos y entidades jurídicas que se dedican al negocio de la banca de inversiones y al corretaje de valores en Estados Unidos, incluyendo a Puerto Rico. Ésta es una *Self-Regulatory Organization* (SRO), es decir, una organización privada reguladora específicamente de la industria financiera y es supervisada por la *U.S. Securities and Exchange Commission* (SEC). A su vez, FINRA -como una SRO- está autorizada por el Congreso de Estados Unidos para proteger a los inversionistas y la integridad del mercado

estadounidense a los fines de que la industria de agentes bursátiles se gestione de manera justa y honesta.**38**

FINRA también funge como un foro de resolución de disputas en la industria de la banca de inversiones y el corretaje de valores.**39** El arbitraje es uno de los procedimientos de resolución de conflictos en dicho organismo y, en particular, se atienden controversias surgidas entre las empresas de inversiones y corretaje de valores y sus clientes, y entre las mencionadas empresas y sus empleados.**40** Este procedimiento de arbitraje privado se rige por los reglamentos aprobados por la propia entidad y, además, el reglamento aplicable dependerá del tipo de disputa que se someta al arbitraje.**41** En particular, como parte de la reglamentación está el Manual de FINRA, el cual consiste de dos (2) componentes principales: (1) las Reglas (las cuales incluyen el Reglamento de FINRA, entre otros) y

---

**38** Véase https://www.finra.org/about (última visita, 14 de febrero de 2022). En Lanza v. Financial Industry Regulatory Authority, 953 F.3d 159, 161 (1st Cir. 2020), el Tribunal Federal de Apelaciones para el Primer Circuito expresó que "FINRA is a private entity that monitors the relationship between financial services companies and consumers".

**39** In re Wolper et al., 189 DPR 292, 297 (2013).

**40** Véase https://www.finra.org/arbitration-mediation/arbitration-overview (última visita, 14 de febrero de 2022). Es importante señalar que las personas que tienen cuentas de inversión en una firma de corretaje de valores, así como las propias firmas de corretaje, firman un contrato como requisito para invertir o trabajar en dicha industria. Mediante ese contrato, quien lo firma se somete a dilucidar cualquier disputa relacionada con la industria de valores ante un panel de árbitros de FINRA. Véase G. Figueroa Prieto, Ética y Conducta Profesional, 84 Rev. Jur. UPR 803, 842 (2015).

**41** In re Wolper et al., supra, págs. 297-298.

(2) la organización corporativa (en la cual se incluyen los Estatutos de la corporación (*By-Laws*)).[42]

La Oficina de Resolución de Conflictos de FINRA (ODR, por sus siglas en inglés) atiende las controversias financieras y de negocio a través de arbitrajes realizados de conformidad con los Estatutos, las Reglas y el Código de Procedimiento de Arbitraje. <u>Lanza v. Financial Industry Regulatory Authority</u>, *supra*, pág. 161. Dentro del Reglamento de FINRA se encuentra el Código de Procedimiento de Arbitraje, así como el Código de Procedimiento de Arbitraje para Disputas de Clientes y el Código de Procedimiento de Arbitraje para Disputas de la Industria.[43]

## 1. **Los miembros y el registro en FINRA**

En el inciso (ee) del Art. I de los Estatutos de FINRA se dispone que "miembro" significa "any broker or dealer admitted to membership in the Corporation".[44] Asimismo, en lo pertinente, el inciso (a) del Art. III, Sec. 1 de los Estatutos de FINRA establece lo siguiente sobre las personas elegibles para ser miembros de FINRA:

> (a) Any registered broker, dealer, municipal securities broker or dealer, or government securities broker or dealer authorized to transact, and whose regular course of business consists in

---

[42] Financial Industry Regulatory Authority, *Rules and Guidance*, https://www.finra.org/rules-guidance/rulebooks (última visita, 14 de febrero de 2022).

[43] Financial Industry Regulatory Authority, *FINRA Rules*, https://www.finra.org/rules-guidance/rulebooks/finra-rules (última visita, 14 de febrero de 2022).

[44] Financial Industry Regulatory Authority, *Article I Definitions*, https://www.finra.org/rules-guidance/rulebooks/corporate-organization/article-i-definitions (última visita, 14 de febrero de 2022).

actually transacting, any branch of the investment banking or securities business in the United States, under the laws of the United States, shall be eligible for membership in the Corporation, except such registered brokers, dealers, or municipal securities brokers or dealers, or government securities brokers or dealers which are excluded under the provisions of Section 3.[45]

Por su parte, el inciso (b)(10) de la Regla 0160 del Reglamento de FINRA define "miembro" en estos términos:

(10) "Member"
The term "member" means any individual, partnership, corporation or other legal entity admitted to membership in FINRA under the provisions of Articles III and IV of the FINRA By-Laws.[46]

En cuanto a la aplicación de la reglamentación de FINRA, el inciso (a) de la Regla 0140 del Reglamento de FINRA dispone lo siguiente:

(a)    The Rules shall apply to all members and persons associated with a member. Persons associated with a member shall have the same duties and obligations as a member under the Rules.[47]

De igual manera, toda persona que se dedique a la industria de la banca de inversiones y el corretaje de valores tiene que registrarse en FINRA. El inciso (a)(1) de la Regla 1013 del Reglamento de FINRA establece el proceso de registro en FINRA, mientras el inciso (a)(2) de la Regla

---

[45]    Financial Industry Regulatory Authority, *Persons Eligible to Become Members and Associated Persons of Members*, https://www.finra.org/rules-guidance/rulebooks/corporate-organization/persons-eligible-become-members-and-associated (última visita, 14 de febrero de 2022).

[46]    Financial Industry Regulatory Authority, *Definitions*, https://www.finra.org/rules-guidance/rulebooks/finra-rules/0160 (última visita, 14 de febrero de 2022).

[47]    Financial Industry Regulatory Authority, *Applicability*, https://www.finra.org/rules-guidance/rulebooks/finra-rules/0140 (última visita, 14 de febrero de 2022).

1013 dispone sobre los formularios de registro uniforme, tal como el Formulario U4. En lo pertinente, los referidos incisos de la Regla 1013 del Reglamento de FINRA leen de la siguiente forma:

> (a) Filing of Application
> (1) How to File
> An Applicant for FINRA membership shall file its application with the Department in the manner prescribed by FINRA. […]
>                    .   .   .   .   .   .   .   .
> (2) Uniform Registration Forms
> Upon approval of the Applicant's FINRA Member Firm Account Administrator Entitlement Form, **the Applicant shall submit its Forms U4 for each Associated Person who is required to be registered under FINRA rules**, any amendments to its Forms BD or U4, and any Form U5 electronically via Web CRD. (Énfasis nuestro).[48]

Al inscribirse en FINRA, todo miembro queda sujeto a su reglamentación y supervisión, **está obligado a registrar una dirección y lugar de empleo en el CRD de FINRA y a mantener actualizada en todo momento su información personal en dicho registro.** En lo pertinente, los incisos (a) y (c) del Art. V, Sec. 2 de los Estatutos de FINRA disponen lo siguiente:

> (a) Application by any person for registration with the Corporation, properly signed by the applicant, shall be made to the Corporation via electronic process or such other process as the Corporation may prescribe, on the form to be prescribed by the Corporation and shall contain:
>      (1) **an agreement to comply** with the federal securities laws, the rules and regulations thereunder, the rules of the Municipal Securities Rulemaking Board and the Treasury Department, **the By-Laws of the Corporation**, NASD Regulation, and NASD Dispute Resolution, **the Rules of the**

---

[48]   Financial Industry Regulatory Authority, *New Member Application and Interview*, https://www.finra.org/rules-guidance/rulebooks/finra-rules/1013 (última visita, 14 de febrero de 2022).

**Corporation, and all rulings, orders, directions, and decisions issued and sanctions imposed under the Rules of the Corporation;** and
      (2) such other reasonable information with respect to the applicant as the Corporation may require.

      .    .    .    .    .    .    .    .

(c) **Every application for registration filed with the Corporation shall be kept current at all times by supplementary amendments** via electronic process or such other process as the Corporation may prescribe to the original application. **Such amendment to the application shall be filed with the Corporation not later than 30 days after learning of the facts or circumstances giving rise to the amendment.** If such amendment involves a statutory disqualification as defined in Section 3(a)(39) and Section 15(b)(4) of the Act, such amendment shall be filed not later than ten days after such disqualification occurs. (Énfasis nuestro).[49]

Según señalado, FINRA requiere que toda persona que se registre para desempeñarse como *registered representative* o corredor de valores complete el Formulario U4,[50] el cual es un documento de registro uniforme.[51] En específico, el

---

[49] Financial Industry Regulatory Authority, *Application for Registration*, https://www.finra.org/rules-guidance/rulebooks/corporate-organization/application-registration (última visita, 14 de febrero de 2022).

[50] En el Formulario U4 se expresa lo siguiente: "The Form U4 is the Uniform Application for Securities Industry Registration or Transfer. Representatives of broker-dealers, investment advisers, or issuers of securities must use this form to become registered in the appropriate jurisdictions and/or SROs". Véase *Form U4 Uniform Application for Securities Industry Registration or Transfer –General Instructions-*, Apéndice del *certiorari*, pág. 262.

Para referencia sobre las instrucciones generales del Formulario U4 completado por el señor Sánchez Rivera allá para el 5 de mayo de 2014 junto a su contrato de empleo con HJ Sims, refiérase al *Form U4 Uniform Application for Securities Industry Registration or Transfer –General Instructions-*, Apéndice del *certiorari*, págs. 262-278.

[51] En relación con este tema, la Regla 1010 del Reglamento de FINRA dispone lo siguiente:

"(a) Filing Requirement

Except as provided in Rule 1013(a)(2), all forms required to be filed by Article IV, Sections 1, 7, and 8, and Article V, Sections 2 and 3, of the FINRA By-Laws shall be filed through

acápite   15A   del   Formulario   U4   se   titula

"Individual/Applicant's Acknowledgment and Consent" y en su

inciso (2) se dispone:

> 2. I apply for registration with the jurisdictions and SROs indicated in Section 4 (SRO REGISTRATION) and Section 5 (JURISDICTION REGISTRATION) as may be amended from time to time and, in consideration of the jurisdictions and SROs receiving and considering my application, **I submit to the authority of the jurisdictions and SROs and agree to comply with all provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the jurisdictions and SROs as they are or may be adopted, or amended from time to time.** I further agree to be subject to and comply with all requirements, rulings, orders, directives and decisions of, and penalties, prohibitions and limitations imposed by the jurisdictions and SROs, subject to right of appeal or review as provided by law.   (Énfasis nuestro y bastardillas omitidas).[52]

## 2. **El arbitraje en controversias surgidas entre empresas de la industria de la banca de inversiones y el corretaje de valores afiliadas a FINRA y sus empleados también registrados en FINRA**

El Código de Procedimiento de Arbitraje para Disputas de

la Industria es el cuerpo legal, dentro del Reglamento de

FINRA, que contiene las reglas que rigen el arbitraje entre

miembros de la industria de inversiones y corretaje de

valores, incluyendo el arbitraje en disputas entre firmas

de corretaje y sus empleados que son consultores de

---

an electronic process or such other process FINRA may prescribe to the Central Registration Depository".   Véase Financial Industry Regulatory Authority, *Electronic Filing Requirements for Uniform Forms,* https://www.finra.org/rules-guidance/rulebooks/finra-rules/1010 (última visita, 14 de febrero de 2022).

[52]   *Form U4 Uniform Application for Securities Industry Registration or Transfer*, Apéndice del *certiorari*, págs. 290-291.

inversiones como sucede en este caso.**53** En particular, el inciso (a) de la Regla 13200 del referido Código dispone sobre el arbitraje obligatorio en las controversias surgidas entre dichas empresas afiliadas a FINRA y sus empleados también registrados en esa entidad. La mencionada regla expone lo siguiente:

> (a) Generally
> Except as otherwise provided in the Code, **a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among:**
>
> - Members;
> - Members and Associated Persons; or
> - Associated Persons. (Énfasis nuestro).**54**

Asimismo, el Formulario U4 también tiene una cláusula de arbitraje obligatorio de toda controversia entre el miembro solicitante y la firma de corretaje para la cual se trabaje. El inciso (5) del acápite 15A del Formulario U4 establece lo siguiente:

> 5. **I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm,** or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that **any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.** (Énfasis nuestro y bastardillas omitidas).**55**

---

**53** Financial Industry Regulatory Authority, *Code of Arbitration Procedure*, https://www.finra.org/arbitration-mediation/code-arbitration-procedure (última visita, 14 de febrero de 2022).

**54** Financial Industry Regulatory Authority, *Required Arbitration*, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13200 (última visita, 14 de febrero de 2022).

**55** *Form U4 Uniform Application for Securities Industry Registration or Transfer*, Apéndice del *certiorari*, pág. 291.

### 3. **La notificación de la *Querella* y el laudo en el procedimiento de arbitraje ante FINRA**

El Reglamento de FINRA establece el procedimiento de notificación cuando se presenta una querella para atenderse mediante arbitraje. De acuerdo con el inciso (c)(1) de la Regla 13300 del Reglamento de FINRA, una vez se presenta una querella, el Director de FINRA emitirá la notificación según lo dispuesto en la Regla 13302.[56] **La notificación de la querella se enviará a la dirección residencial del querellado o a su lugar habitual de morada y, en caso de que no se pueda notificar en alguna de éstas, la notificación se enviará a la dirección de empleo.** En lo pertinente, la Regla 13301 del Reglamento de FINRA dispone que:

> (a) The Director will serve the Claim Notification Letter on an associated person directly at the **person's residential address or usual place of abode. If service cannot be completed** at the person's residential address or usual place of abode, the Director will serve the Claim Notification Letter on the associated person at the **person's business address.** (Énfasis nuestro).[57]

Por su parte, la Regla 13302 del Reglamento de FINRA establece lo siguiente en torno a los medios de notificación:

> (c) Service by Director
>     Unless the statement of claim is deficient under Rule 13307, **the Director will serve the Claim Notification Letter on the respondent(s) pursuant to Rule 13302.** The Director will send a copy of the Submission Agreement, the statement of claim, and

---

[56] Financial Industry Regulatory Authority, *Filing and Serving Documents*, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13300 (última visita, 14 de febrero de 2022).

[57] Financial Industry Regulatory Authority, *Service on Associated Persons*, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13301 (última visita, 14 de febrero de 2022).

any additional materials filed by the claimant to each arbitrator **by first-class mail, overnight mail service, overnight delivery service, hand delivery, email or facsimile or through the Arbitrator and Mediator Portal**, once the panel has been appointed. (Énfasis nuestro).[58]

Asimismo, al completar el requerido Formulario U4 -incluido como parte del contrato de empleo-, se consiente expresamente a que la notificación se realice por cualquiera de los medios expresados en el inciso (7) del acápite 15A del mencionado formulario y a que dicha notificación se considere válida y vinculante en cualquier tribunal o foro administrativo. Específicamente, el referido inciso expone lo siguiente:

7. **I consent that the service of any process,** pleading, subpoena, or other document in any investigation or administrative proceeding conducted by the SEC, CFTC or a jurisdiction or in any civil action in which the SEC, CFTC or a jurisdiction are plaintiffs, or the notice of any investigation or proceeding by any SRO against the applicant, **may be made by personal service or by regular, registered or certified mail or confirmed telegram to me at my most recent business or home address as reflected in this Form U4, or any amendment thereto, by leaving such documents or notice at such address, or by any other legally permissible means.**

**I further stipulate and agree that any civil action or administrative proceeding instituted by the SEC, CFTC or a jurisdiction may be commenced by the service of process as described herein,** and that service of an administrative subpoena shall be effected by such service, **and that service as aforesaid shall be taken and held in all courts and administrative tribunals to be valid and binding as if personal service thereof had been made.** (Énfasis nuestro).[59]

---

[58] Financial Industry Regulatory Authority, *Filing and Serving an Initial Statement of Claim*, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13302 (última visita, 14 de febrero de 2022).

[59] *Form U4 Uniform Application for Securities Industry Registration or Transfer*, Apéndice del *certiorari*, pág. 291.

En cuanto al laudo arbitral, los incisos (a), (b) y (c) de la Regla 13904 del Reglamento de FINRA establecen que:

> (a) All awards shall be in writing and signed by a majority of the arbitrators or as required by applicable law. **Such awards may be entered as a judgment in any court of competent jurisdiction.**
>
> (b) Unless the applicable law directs otherwise, **all awards rendered under the Code are final and are not subject to review or appeal.**
>
> (c) The Director will serve the award on each party, or the representative of the party. (Énfasis nuestro).[60]

## B. **El caso Román Ortiz v. OGPe,** *supra,* **y la doctrina de los esfuerzos adicionales razonables ante la devolución de notificaciones por el correo postal**

En Román Ortiz v. OGPe, *supra*, la controversia giraba en torno a si la notificación de una determinación administrativa devuelta por el correo -por no encontrarse un buzón en el cual depositarla (*no mail receptacle*)- constituía una notificación adecuada, particularmente cuando la **agencia administrativa** remitente conocía dicha situación y, a pesar de tener alternativas remediales a su alcance, no realizó ningún esfuerzo adicional razonable para renotificarla. Íd., pág. 950. Haciendo referencia a la doctrina de los esfuerzos adicionales razonables elaborada por el Tribunal Supremo de Estados Unidos en Jones v. Flowers, 547 US 220 (2006), en esa ocasión, expresamos lo siguiente:

---

[60] Financial Industry Regulatory Authority, *Awards*, https://www.finra.org/rules-guidance/rulebooks/finra-rules/13904 (última visita, 14 de febrero de 2022).

[En Jones v. Flowers, *supra*] se resolvió que cuando el Estado tiene información que indique que su intento de notificar fue inefectivo, [é]ste tiene la obligación de proceder tal y como lo haría "una persona realmente deseosa de informar" a la parte afectada por la determinación gubernamental adversa. De esa forma, **el Máximo Foro federal concluyó que correspondía al remitente de la notificación devuelta el tomar los pasos adicionales para informar al destinatario, toda vez que la información recibida en ese caso confirmaba a la agencia que el destinatario no recibió la notificación** y que, por lo tanto, desconocía del procedimiento en curso y su derecho a comparecer para defender sus intereses. (Énfasis nuestro y citas omitidas). Román Ortiz v. OGPe, *supra*, pág. 960.

Así pues, en Román Ortiz v. OGPe, *supra*, pág. 964, expusimos que cuando una agencia administrativa notifica una determinación final adversa a una parte a la dirección correcta y de acuerdo con los mecanismos autorizados, pero la misma es devuelta, esto no convierte automáticamente en suficiente dicha notificación. Ante lo cual, resolvimos que cuando una agencia administrativa tiene información que le permita conocer que sus intentos de notificar a la parte interesada han sido inútiles, entonces debe hacer los esfuerzos adicionales razonables como se esperaría de una agencia realmente deseosa de informar a las partes afectadas por una decisión adversa. Íd., págs. 964-965. Claro está, esas diligencias no exigen que las agencias hagan lo absurdo e imposible, sino que sólo requieren que se haga lo razonable a la luz de la totalidad de las circunstancias de cada caso. Íd., pág. 965.

## III

En su Alegato, HJ Sims expuso que, como parte del contrato de empleo, las partes acordaron que se someterían

a la jurisdicción de FINRA, así como a toda su reglamentación para dilucidar sus disputas. Además, expuso que, como requisito para la práctica de su profesión, el señor Sánchez Rivera se obligó a cooperar con FINRA en el proceso de la notificación de los procedimientos de arbitraje, esto a los fines de revelar y mantener actualizada su dirección en el CRD de FINRA. De igual manera, expresó que el señor Sánchez Rivera había consentido expresamente, a través del Formulario U4, a que se le diligenciaran las notificaciones dejándole copia de los documentos en su dirección de empleo más reciente, sin mayor formalidad o requisito.

HJ Sims también añadió que el proceso de notificación se realizó conforme a las reglas aplicables de FINRA e, incluso, aunque no era requerido, se le notificó mediante dos (2) de los métodos de diligenciamiento permitidos por FINRA y que fueron autorizados expresamente por el señor Sánchez Rivera (en particular, según las Reglas 13301 y 13302 del Reglamento de FINRA y el Formulario U4). Al respecto, indicó que ello satisfacía cualquier criterio de razonabilidad. Y, por último, expresó que este caso se distingue de lo resuelto en Román Ortiz v. OGPe, *supra*, porque aquí la devolución de la correspondencia no ocurrió por razones ajenas a la voluntad del destinatario, sino por el incumplimiento del señor Sánchez Rivera con la obligación que tenía -como miembro de FINRA- de mantener actualizada su información en el CRD de FINRA y notificar su dirección correcta.

Por otra parte, en su Alegato, el señor Sánchez Rivera reiteró que en el proceso de arbitraje nunca le notificaron personalmente los documentos ni hubo un emplazamiento. Expuso que, dado al incumplimiento con el derecho a una "notificación constitucional" o en violación al Reglamento de FINRA, lo que procedía era la nulidad del resultado, es decir, que ante la falta de notificación adecuada se procediera a declarar nulo el *Laudo* emitido por FINRA. En relación con lo resuelto en <u>Román Ortiz v. OGPe</u>, *supra*, indicó que dicha *Opinión* es una decisión de rango constitucional sobre adecuada notificación en nuestra jurisdicción y que allí no se establece que sería inaplicable a una entidad como FINRA.

De manera que, la controversia que nos ocupa se circunscribe a resolver si la *Querella* presentada por HJ Sims en contra del señor Sánchez Rivera en un proceso de arbitraje fue notificada adecuadamente por FINRA.

A la luz del derecho aplicable y luego de ponderar los argumentos de ambas partes, estamos en posición de resolver el asunto ante nuestra consideración.

**IV**

En su recurso de *certiorari* ante este Tribunal, HJ Sims planteó que el Tribunal de Apelaciones erró al revocar la *Sentencia* del foro de instancia por el fundamento de que era necesario evaluar si FINRA había cumplido con el estándar sobre esfuerzos adicionales razonables. Le asiste la razón. Veamos.

Según surge del récord, FINRA envió -por correo regular- una primera notificación de la *Querella* el 28 de septiembre de 2018 a la dirección que constaba en el CRD de FINRA: C 15 #1260 Ext. San Agustín, San Juan, PR 00926. La misma fue devuelta por el correo postal con esta nota: *return to sender*. Luego de vencido el término para contestar la *Querella*, FINRA envió -por correo regular y el DR Portal- una segunda notificación de la *Querella* a la mencionada dirección, según constaba en el CRD de FINRA. De igual manera, ésta fue devuelta por el correo postal con la nota siguiente: *return to sender*. Una vez más, en noviembre de 2018, FINRA envió una tercera notificación de la *Querella* a la dirección que constaba en el CRD de FINRA.

Ante esto, el 13 de diciembre de 2018, FINRA le solicitó a HJ Sims que proveyera una dirección alterna del señor Sánchez Rivera. Entonces, oportunamente, HJ Sims informó la dirección de empleo de éste: First Southern, LLC, Metro Office Park, 8 Calle #1, Ste. 401, Guaynabo, PR 00968-1772. Así, HJ Sims informó a FINRA que un emplazador había notificado la *Querella* y otros documentos relacionados en la dirección alterna provista. Aparte de esa notificación, el 28 de diciembre de 2018, FINRA **nuevamente** envió al señor Sánchez Rivera la notificación de la *Querella* a la dirección alterna provista. Así pues, FINRA continuó enviando sus comunicaciones, así como el *Laudo*, a dicha dirección alterna. **No surge del expediente que éstas fueran devueltas por el correo postal.** Incluso, en el récord del caso ante

FINRA surgía claramente que la dirección alterna correspondía al lugar de empleo del señor Sánchez Rivera en aquel momento: First Southern.[61]

Coincidimos con HJ Sims en que la doctrina esbozada en Román Ortiz v. OGPe, *supra*, sobre esfuerzos adicionales razonables **no** aplica al presente caso. En particular, el caso ante nuestra consideración **se distingue** fundamentalmente de Román Ortiz v. OGPe, *supra* -el cual el Tribunal de Apelaciones utilizó para sustentar su decisión- en dos (2) asuntos puntuales: (1) FINRA es una entidad privada con su propia reglamentación, y (2) no se trata de la devolución de correspondencia por razones ajenas a la voluntad del destinatario.

**En primer lugar**, FINRA **no** es una agencia administrativa, sino -como mencionamos previamente- es un organismo no gubernamental que regula todas las firmas de agentes bursátiles y corredores de bolsa en la industria de valores en Estados Unidos.[62] Además, a través de su Oficina de Resolución de Conflictos, provee un foro especializado de arbitraje en el que se atienden controversias relacionadas con el ámbito de la banca de inversiones y el corretaje de valores. Al ser una entidad privada, ésta cuenta con su propia reglamentación, la cual rige las actividades de las firmas de corretaje y los asesores financieros (brókers)

---

[61] *Case Information Sheet*, Apéndice del *certiorari*, págs. 310-311.

[62] El Tribunal de Apelaciones se refirió a FINRA como "agencia" en varias instancias a través de su *Sentencia*. Véase *Sentencia del Tribunal de Apelaciones*, Apéndice del *certiorari*, págs. 16-18.

registrados en Estados Unidos. En particular, dicha reglamentación constituye el cuerpo de reglas que aplica a los miembros de FINRA, ya que así se les requiere para poder desempeñarse en la industria de valores en Estados Unidos.

Como vemos, FINRA es una entidad privada y sus reglas son de aplicación uniforme en todas las jurisdicciones de Estados Unidos, incluyendo Puerto Rico.[63] Así pues, no está en controversia que HJ Sims y el señor Sánchez Rivera suscribieron una cláusula de arbitraje en su contrato de empleo y se sometieron voluntariamente a la reglamentación de FINRA. Por consiguiente, ambas partes estaban sujetas a que ese foro las regulara. Por todo lo cual, concluimos que, mediante su *Sentencia*, el Tribunal de Apelaciones ignoró y anuló *de facto* la reglamentación uniforme referente a cómo FINRA realiza las notificaciones a sus miembros en un procedimiento de arbitraje ante el mencionado foro.

**En segundo y último lugar**, el señor Sánchez Rivera, como corredor de valores, estaba sujeto a la reglamentación de FINRA y tenía que mantener al día su dirección en los récords de dicha entidad; al no hacerlo, se expuso a que se le notificara en la dirección que constaba en el CRD. A pesar de que las devoluciones por el correo postal ocurridas en este caso fueron como consecuencia del incumplimiento del señor Sánchez Rivera con la reglamentación de FINRA, **la mencionada entidad fue más allá y solicitó a HJ Sims que se**

---

[63] Para referencia sobre FINRA, véase nota al calce 1.

**le proveyera una dirección alterna para que se notificara nuevamente la *Querella* y así se hizo**. Ante esto, FINRA continuó enviando las comunicaciones subsiguientes al señor Sánchez Rivera a dicha dirección alterna, incluyendo el *Laudo*, según señalamos, y del expediente no surge que éstas fueran devueltas por el correo postal. Incluso, tan es así que el señor Sánchez Rivera pudo presentar oportunamente su *Solicitud de revocación de laudo de arbitraje* ante el tribunal de instancia.

En conclusión, la doctrina esbozada en Román Ortiz v. OGPe, supra, sólo aplica en el contexto de las agencias administrativas y **no** se extiende a un procedimiento de arbitraje ante un ente como FINRA, la cual es una entidad privada que tiene su propia reglamentación uniforme para todas las jurisdicciones.

Luego de un examen exhaustivo del expediente y la normativa aplicable, resolvemos que la *Querella* presentada por HJ Sims en contra del señor Sánchez Rivera fue notificada adecuadamente por FINRA. En particular, que éste fue notificado en conformidad con la reglamentación de FINRA y, por tanto, procedía darle deferencia a la determinación del árbitro en cuanto a que la notificación fue adecuada y no se vulneró el debido proceso de ley. Así pues, coincidimos con lo resuelto por el tribunal de instancia a los efectos de que procedía confirmar el *Laudo* y, en consecuencia, desestimar la *Solicitud de revocación de laudo de arbitraje* presentada por el señor Sánchez Rivera.

**V**

Por los fundamentos antes expuestos, se revoca la *Sentencia* emitida por el Tribunal de Apelaciones el 29 de junio de 2020 y se reinstala la *Sentencia* dictada por el Tribunal de Primera Instancia el 20 de noviembre de 2019.

Se dictará Sentencia en conformidad.


ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Jaime Isaac Sánchez Rivera

    Recurrido

        v.

Herbert J. Sims & Co., Inc.

    Peticionario

CC-2020-412     *Certiorari*


SENTENCIA

En San Juan, Puerto Rico, a 16 de febrero de 2022.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, revocamos la Sentencia del Tribunal de Apelaciones emitida el 29 de junio de 2020 y reinstalamos la Sentencia dictada por el Tribunal de Primera Instancia el 20 de noviembre de 2019.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez concurre y emite la expresión siguiente:

> Estoy de acuerdo con la determinación de revocar el dictamen del Tribunal de Apelaciones y reinstalar la decisión del foro primario que desestimó la impugnación del laudo de arbitraje en controversia. Emito un voto concurrente pues estimo que para resolver este caso no era necesario evaluar si el precedente de Román Ortiz v. OGPe, 203 DPR 947 (2020) se extendía a procesos que no son administrativos. La controversia medular que debíamos atender es si la *Financial Industry Regulatory Authority* (FINRA) cumplió con sus

normativas y reglamentos en el proceso de arbitraje que motivó este caso a los fines de determinar si las notificaciones fueron adecuadas. Los hechos del caso confirman que, bajo los estándares de la FINRA, se hicieron gestiones razonables y adicionales para contactar al querellado. Este análisis bastaba para resolver la controversia. Siendo así, era innecesario discutir y pautar si un precedente reciente de este Tribunal aplicaba en este contexto. Más aun cuando se trata de un precedente que se emitió en un ámbito muy distinto y ante hechos diferentes a los de este caso.

El Juez Asociado Señor Estrella Martínez concurre sin Opinión escrita.


                        Javier O. Sepúlveda Rodríguez
                        Secretario del Tribunal Supremo